952 F.2d 404
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Defendant-Appellee,
v.
Richard C. PELFREY, Plaintiff-Appellant.
 No. 90-3731.
 United States Court of Appeals, Sixth Circuit.
 Dec. 16, 1991.
 
 Before NATHANIEL R. JONES and DAVID A. NELSON, Circuit Judges, and JOINER, Senior District Judge.*
 PER CURIAM.
 
 
 1
 This is an appeal from a criminal sentence that represents a substantial upward departure from the sentence range that the United States Sentencing Guidelines prescribe for "typical cases."
 
 
 2
 The defendant pleaded guilty to having violated 18 U.S.C. § 876 by placing in the mails, with intent to extort a sum of money, a letter in which he threatened to injure or kill a prominent young entertainer and her father. The defendant's criminal history placed him in the sentencing guidelines' lowest criminal history category, Category I. His offense level, as calculated by a probation officer, was 12. The statute provides that violators of the extortion provision of § 876 are subject to imprisonment for up to 20 years, but the guideline range for a level 12 offense committed by a Category I defendant is imprisonment for only 10-16 months.
 
 
 3
 The government moved for imposition of a sentence above this range. The district court then sentenced the defendant to imprisonment for six years, plus a three-year period of supervised release.
 
 
 4
 The defendant makes four contentions on appeal:
 
 
 5
 (1) That the district court failed to state the specific factors upon which it relied to justify a departure from the guideline range;
 
 
 6
 (2) That the district court failed adequately to articulate its rationale for the extent of the departure;
 
 
 7
 (3) That it was unreasonable to impose a sentence four and one-half times the guideline maximum; and
 
 
 8
 (4) That the defendant did not receive advance notice, as required by Burns v. United States, 111 S.Ct. 2182 (1991), that an upward departure (on specified grounds) would be at issue.
 
 
 9
 We do not find the first contention persuasive. We agree with the second, however, and we shall remand the case for resentencing on that ground. This disposition of the case makes it unnecessary for us to determine whether a six-year sentence could be upheld under a proper rationale, or whether the defendant received adequate notice that a departure would be at issue.
 
 
 10
 * The defendant was born in 1952. The first indication of a mental problem, as far as we know, dates to 1976, when the defendant spent a month in a U.S. Navy hospital for what was diagnosed as "schizophrenia, paranoid type."
 
 
 11
 The defendant was married in 1977, and he and his wife now have four children. In April of 1988, a few months before his 36th birthday, the defendant started writing fan letters to a teenaged singing star named Debbie Gibson. Concerned about the increasingly amorous tone of the letters, and believing that they came from a teenager, Ms. Gibson's father telephoned the defendant's home in Barberton, Ohio, in an effort to let the defendant know that his attentions were unwelcome. After speaking with the defendant's wife, Mr. Gibson talked with the defendant himself and told him to forget about Debbie.
 
 
 12
 The defendant interpreted the call as a sign that Debbie Gibson was in fact interested in him. Hoping to see her in person, he drove from Barberton to a town in New York state where the Gibson family owned a house. The house was rented to other people, and Debbie was not available, but the defendant refused to believe that she did not live there. He continued writing letters to her, but the letters now evinced considerable hostility; the defendant threatened to get even with the Gibson family for refusing to let him see Debbie, and he spoke of blowing up the Gibsons' house.
 
 
 13
 The Gibsons relocated their tenants as a safety precaution and alerted law enforcement officials in the Barberton area to the defendant's bizarre behavior. Deputies from the local sheriff's office went to the defendant's home, at which time they apparently learned from his wife that there were a number of weapons in the house. (The wife later told the court that there had been three rifles and a handgun in the residence for ten or eleven years, but by the time of the defendant's plea hearing the weapons had been turned over to a relative who was a police officer.)
 
 
 14
 Sheriff's deputies arrested the defendant in August of 1988 and put him in jail over a weekend, hoping that this would bring a halt to the correspondence. It did not. The defendant continued to write, blaming Mr. Gibson for the humiliation of the arrest and making what the presentence report describes as "glib death threats," along with "pledges of love and devotion for Debbie."
 
 
 15
 Agents of the Federal Bureau of Investigation interviewed the defendant at his home on May 26, 1989, showing him letters in which he had threatened to blow up the Gibson house. A letter dated May 19, 1989, part of which was read to the court at the sentencing hearing, said among other things that "everyone in that house will die. I told you where I was heading, Hinckley and Charles Manson."
 
 
 16
 The defendant told the FBI agents that he had made the threats to frighten the Gibsons into paying him money "for all the trouble they had caused him." The agents warned the defendant to stop writing letters.
 
 
 17
 The defendant's wife had him placed in a Veterans Administration hospital for five days in the early part of June, 1989. The diagnosis made at this time was consistent with that made at the Navy hospital in 1976: "Paranoid schizophrenia, chronic with acute exacerbation."
 
 
 18
 On September 6, 1989, the defendant wrote a seven-page letter to Mr. Gibson. This letter, which was the subject of the charge to which the defendant ultimately pleaded guilty, expressed both disappointment in Debbie's failure to respond and hatred of Mr. Gibson for embarrassing the defendant and his family. Debbie was scheduled to appear at the Blossom Music Center, near the defendant's place of employment, on September 13, 1989, and the letter stated with reference to this appearance that "I will not permit Debbie to perform. I will die or Debbie will die."
 
 
 19
 FBI agents went to the defendant's home on the day of the Blossom performance and were told that the defendant was not there. His wife said she did not know how to contact him. The defendant was arrested at work on the following day.
 
 
 20
 On motion by the government, the court ordered that the defendant undergo a psychiatric examination. He was sent to the Federal Medical Center at Springfield, Missouri, and was kept there for almost three months. The government told the court at the sentencing hearing that the medical center took away the defendant's letter-writing privileges, but he nonetheless managed to send letters to Debbie Gibson from Springfield. The clinical staff at the medical center finally concluded that the defendant suffered from a "delusional paranoid disorder, erotomania type," but expressed the opinion that he "is presently competent to stand trial and was not suffering from a severe mental disease or defect that caused him to be unable to appreciate the nature and quality or the wrongfulness of his acts."
 
 
 21
 At a hearing following his return to Ohio the defendant stipulated to the report from the medical center; the court found him mentally competent to stand trial, and bond was set at $10,000 cash. The defendant subsequently waived indictment and pleaded guilty to a one count information charging him with the violation of 18 U.S.C. § 876.
 
 
 22
 On motion of his counsel, the defendant's bond was then reduced to a $5,000 cash or $10,000 surety bond. The court explained that the bond was subject to being withdrawn if there were any more letters, and the defendant said he understood. The court also explained to the defendant that the matter was being referred to the probation department for a presentence investigation.
 
 
 23
 On June 27, 1990--the same day that the probation officer completed his presentence report--the defendant's bond was revoked, at the government's request, because the defendant had written yet another threatening letter. This one, according to the government, threatened FBI agents and police officers as well as Debbie and her father.
 
 
 24
 Again the defendant was arrested. At the time of this arrest he was found wearing attire that was, we gather, somewhat unusual for a man.
 
 
 25
 The presentence report submitted by the probation officer at the end of June calculated the guideline range at 10-16 months, as stated above, but also alerted the defendant to the existence of "FACTORS THAT MAY WARRANT DEPARTURE." In this connection the report stated that "[t]he defendant's amorous obsession with a media figure presents a factor which does not seem to be taken into account by the Guideline[s]." This language was repeated in a revised presentence report prepared after the defendant made certain objections to the original report.
 
 
 26
 On the afternoon of July 17, 1990, one day before the sentencing hearing, the government filed a motion requesting an upward departure. A memorandum accompanying the motion read as follows:
 
 
 27
 "Title 18, United States Code, Section 3553(b) gives the court authority to sentence outside the guideline range if the court finds that there exist [sic] an aggravating circumstance not adequately taken into consideration by the guidelines. The aggravating circumstances in this case are well documented. The defendant harassed his victim for years. Even after the defendant was arrested, indicted and entered a guilty plea, he continued to send a threatening letter.
 
 
 28
 The guidelines do not adequately take into consideration all the aggravating circumstances. Therefore the government requests an upward departure in the sentence of the defendant."
 
 
 29
 Counsel for the defendant was told about the motion by telephone at the time it was filed, and she received a copy a few minutes before the start of the hearing the next day.
 
 
 30
 During the course of the sentencing hearing the court heard an extensive statement by a private security consultant whom Debbie Gibson and her family had retained. The consultant told the court, among other things, that the family had incurred expenditures of almost $50,000 as a result of the defendant's conduct; that the defendant's letters, his visit to Debbie's home town in New York, and his behavior when Debbie was scheduled to perform at Blossom Music Center all suggested "dangerousness to ... Debbie Gibson, her father, [and] to people who might intervene;" that media figures receive a lot of threatening communications, and when such communications are coupled with "stalking" activities they produce--and are designed to produce--fear and anxiety; and that the defendant's conduct was particularly troublesome because it had continued notwithstanding the intervention of law enforcement officers and the courts.
 
 
 31
 After completion of the security consultant's statement, the court heard argument from the government in support of its motion for a departure. The government reminded the court that the defendant had written over 100 letters to the victim, that neither incarceration nor warnings from the court had deterred the defendant from writing, and that the final letter--the one that led to the revocation of the defendant's bond--had expanded the threats to include FBI agents and police officers.
 
 
 32
 The defendant's counsel then addressed the court, noting that there had been no threatening communications until after the defendant's visit to New York and emphasizing that the defendant had not made any attempt to see Debbie Gibson during the period when he was out on bond. Counsel pointed out that the defendant had already been incarcerated for some seven months, and she argued that an upward departure would not be appropriate on the basis of one post-conviction letter. With respect to the defendant's mental condition, she said that although she believed there was evidence of a problem that "needs some attention," the defendant had instructed her not to pursue this matter because he did not want to wind up in Springfield again. She also said that the defendant had asked that the details of his attire at the time of his last arrest not be placed on the record.
 
 
 33
 The defendant was asked if he would like to address the court directly, but he declined to do so. In response to a question from the court, the defendant acknowledged that he had understood everything that had been said during the sentencing hearing.
 
 
 34
 Following a brief recess, the district judge delivered a statement from the bench explaining the reasons that had led him to conclude that the government's motion for an upward departure should be granted. We shall consider the content of the court's statement in the following section of this opinion.
 
 II
 
 35
 Under the Sentencing Reform Act of 1984, a district court must impose a sentence within a range determined in accordance with the guidelines "unless the court finds that there exists an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). The Commission has told us, at page 1.5 of the first chapter of its Guidelines Manual (November 1, 1990), that
 
 
 36
 "The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one ... where conduct significantly differs from the norm, the court may consider whether a departure is warranted." (Emphasis supplied.)
 
 
 37
 If the sentencing court determines that a departure is warranted, it must "state the specific reason for the imposition a sentence different from that described." 18 U.S.C. § 3553(c)(2); cf. United States v. Newsome, 894 F.2d 852, 856 (6th Cir.1990).
 
 
 38
 This court has explained that "when the district court chooses to depart from the Guidelines, 'a short clear written statement or a reasoned statement from the bench' must support the departure." United States v. Fitzwater, 896 F.2d 1009, 1011 (6th Cir.1990), (quoting United States v. Rodriquez, 882 F.2d 1059, 1066 (6th Cir.1989), and United States v. Perez, 871 F.2d 45, 47 (6th Cir.), cert. denied, 492 U.S. 910 (1989).) The statement must give "a specific reason for the imposition of the sentence, identifying clearly 'the aggravating factors and [the court's] reasons for connecting them to the permissible grounds for departure.' " Id. (quoting United States v. DeLuna-Trujillo, 868 F.2d 122, 124 (5th Cir.1989)). The statement should be specific enough for an appellate court to conduct a meaningful review. Id.
 
 
 39
 The case at bar was clearly not a "typical" case. In one of his letters the defendant explicitly said he was heading in the direction of John Hinckley, the man whose amorous obsession with a young female media figure led him to shoot President Reagan, Press Secretary Brady, and two police officers. The district court referred to this very troubling factor in the statement it gave from the bench, asking rhetorically if defendant might turn out to be another Hinckley: "Is it possible that there could be overt action taken against others for the purpose of impressing [Debbie Gibson with] his importance, his affection, and whatever else his feeling may be toward her?" The court went on to say that it could not answer this question because of the defendant's unwillingness to permit further investigation of his mental condition.
 
 
 40
 The judge then discussed the final letter, the one that had caused the revocation of the bond, stating that he found in that communication a "stridency" and a degree of "mysticism" not noticed in the earlier letters. Against this background, and having regard to the fact that the supervisory conditions imposed in connection with the bond had already been violated by the defendant, the fact that the court was dealing with "the life of a young woman who has some fatal attraction for [the defendant]," and the fact that the court could not be assured that the problem would not recur, the court granted the motion for a departure. For the reasons indicated, the court stated, the guideline range as calculated by the probation department "does not to my mind give [sufficient] emphasis to the threat posed by this defendant to Miss Gibson, to Miss Gibson's family, or to perhaps other members of the community."
 
 
 41
 A departure was fully justified here, in our view, and we see nothing wrong with the district court's explanation of why it was justified. The defendant is not likely to kill or injure anyone as long as he is confined, and it was not unreasonable for the district court to treat the threat of a Hinkley-type tragedy as too serious a matter for the defendant to be released only 16 months from the time of sentencing.
 
 III
 
 42
 The decision that a departure was appropriate does not end our inquiry. Under the statute, we must also review the reasonableness of the extent of the departure. 18 U.S.C. §§ 3742(e)(3) and (f)(2).
 
 
 43
 In this case, as in United States v. Lassiter, 929 F.2d 267, 271 (6th Cir.1991), the district court failed to justify the degree of departure in light of what the Court of Appeals for the Ninth Circuit has called "the structure, standards and policies of the Act and Guidelines." United States v. Lira-Barraza, 941 F.2d 745, 751 (9th Cir.1991) (en banc ). The absence of any such justification makes it difficult for us to determine the reasonableness of the 56-month departure that the court chose to impose.
 
 
 44
 If the district court had arrived at a sentence by treating the defendant as belonging in a criminal history category higher than Category II, our precedents suggest that the district court would have been required to look first at Criminal History Category II (that being the category next to the one in which the guidelines placed the defendant) and explain why a sentence within the guideline range for Category II would not be appropriate. Lassiter, 929 F.2d at 271; United States v. Kennedy, 893 F.2d 825, 829 (6th Cir.1990).
 
 
 45
 In actuality, as noted earlier, the guidelines placed the defendant's criminal history category at I and his offense level at 12. The first point in the sentencing table matrix where the guideline range exceeds 71 months comes at the intersection between Criminal History Category VI and Offense Level 19. The guideline range for those variables is imprisonment for 63-78 months. If a sentence within that range is appropriate (as it may well be), the district court needs to explain why--and it needs to do so by linking this case to specific offense levels and specific criminal history categories. See United States v. Osborne, 948 F.2d 210, 1991 U.S.App.LEXIS 26162 (6th Cir.1991), for an illustration of how this approach operates.
 
 
 46
 The defendant's sentence is VACATED, and the case is REMANDED for resentencing. This disposition of the case makes it unnecessary for us to reach the defendant's remaining assignments of error.
 
 
 47
 JOINER, Senior District Judge, concurring in part and dissenting in part.
 
 
 48
 I agree that the trial court appropriately articulated justifications for an upward departure from the guidelines. However, I disagree with the majority's decision to remand for a statement of justifications for the extent of the departure. As the majority recognizes, the trial court expressed a "not unreasonable" concern that defendant presents a threat of future violence toward Ms. Gibson. That the trial court failed to synthesize on the record its recognition of defendant's dangerous mental state with specific offense levels and criminal history categories is not reason enough to vacate defendant's sentence. Remanding only to accomplish a mechanical application of sentencing guideline procedures is a waste of judicial time in this case. I would affirm defendant's sentence.
 
 
 
 *
 The Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation